**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**PHILLIP L. NEAR**
**PO Box 1394**
**Independence, KS 67301**

**Plaintiff,**

**v.**

**FRANK CRIVELLO**
**3408 Dover Road**
**Pompano Beach, Florida 33062**

**TITAN GLOBAL HOLDINGS, INC.**
**1700 Jay Ell Drive**
**Suite 200**
**Richardson, Texas 75801**

**DAVID MARKS**
**10732 N. River Valley Dr.**
**Mequon, Wisconsin 53092**

**BRYAN CHANCE**
**Serve at: Crescent Fuels**
**116 W. Myrtle**
**Independence, Kansas 67301**

**GRAYSTONE BUSINESS CREDIT, LLC**
**152 West 57th Street**
**60th Floor**
**New York, New York 10019**

**GOLDBERG KOHN BELL BLACK**
**ROSENBLOOM & MORITZ, LTD.**
**55 East Monroe Street**
**Suite 3300**
**Chicago, Illinois 60603**

**Defendants.**

**Case No.** 09-CV-2233 JWL/JPO

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff, Phillip Near, by and through his attorneys and for his causes of action against Defendants, states and alleges as follows:

**NATURE OF THE CLAIMS**

1. Plaintiff has lost his company, his life savings, and his business reputation by the repugnant, fraudulent, and unlawful conduct of the Defendants. At one time, Phillip Near was a successful businessman known throughout Kansas and surrounding States for his work in the fuel distribution business. He was President of Crescent Fuels, Inc., and its subsidiaries, including Crescent Oil, Inc. Crescent Oil was successful prior to the actions of Defendants, discussed in further detail below. In 2008 Crescent Oil was delivering almost 300 million gallons of fuel to hundreds of gas stations and had sales just short of $1 Billion.

2. The success of Phillip Near came to a screeching halt in 2008 when Defendants entered the scene and committed fraud. Defendants lied, cheated, and stole from Near. Defendants made false promises to Near about their ability to fund the purchase of Crescent and their willingness and ability to fund future operations of Crescent, so as to allow it to expand even further. They promised Near valuable stock, funding of operations, employment, and – perhaps most importantly – the extinguishment of Near's personal guarantees, including his guarantee of a $35 Million loan issued by M&I Bank, in exchange for his ownership interest in Crescent.

3. None of the promises made by Defendants were fulfilled. Near has yet to receive *anything* of value for his ownership interest in Crescent. Instead, Defendants have pilfered the Crescent Companies of assets and cash and left Near on the hook for it

all. In doing so, they have driven Crescent – once a very successful business with a reputation second to none – into bankruptcy and have placed Near on the verge of doing the same.

4. Defendants made false statements to Plaintiff. Defendants breached promises made to Plaintiff. Defendants stole from Plaintiff.

5. Phillip Near therefore brings this action, seeking the millions of dollars he is owed.

**THE PARTIES**

6. Phillip Near is a resident of the State of Kansas. Prior to the unlawful actions of Defendants, he was the president and majority shareholder of Crescent Fuels, Inc. Crescent Fuels, in turn, was sole owner of numerous subsidiaries including Crescent Oil Company, Inc., Crescent Corporation, Crescent Stores Corporation, Crescent Holdings, Inc., and Crescent Realty, Inc.. The collective Crescent entities are referred to throughout as "Crescent."

7. Defendant Titan Global Holdings, Inc. ("Titan") is a publicly held corporation organized under the laws of the State of Utah. Titan's principle place of business is in Richardson, Texas. Titan has had extensive contacts and conducted extensive and ongoing business in the State of Kansas.

8. Defendant Frank Crivello is a resident of the State of Florida. Crivello, through one or more of his many entities, is a major shareholder of Titan. Crivello has conducted extensive business in the State of Kansas, including several in-person meetings with Near in the State.

9. Defendant David Marks is a resident of Wisconsin. Marks is the Chairman of Titan and, through one or more of his business entities, a shareholder of Titan. He also claims to be a director of Crescent. Marks conducted extensive business in the State of Kansas, including several in-person meetings with Near in the State.

10. Defendant Bryan Chance is a resident of Texas. Chance is the Chief Executive Officer of Titan. Chance also claims to be a director and officer of Crescent. Chance has conducted extensive business in the State of Kansas and continues to run the day-to-day operations of Crescent in Kansas.

11. Defendant Greystone Business Credit, LLC ("Greystone") is a Delaware limited liability company headquartered in the State of New York. Greystone, through its agents including, without limitation, its lawyers, has conducted business in the State of Kansas.

12. Defendant Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd. ("Goldberg Kohn") is a law firm with its principal place of business in Chicago, Illinois. At all times relevant, Goldberg Kohn was counsel to Greystone. Goldberg Kohn has conducted business in the State of Kansas in connection with the facts set forth below. Specifically, one or more lawyers from Goldberg Kohn made numerous contacts with persons and entities in this State.

**JURISDICTION AND VENUE**

13. Subject matter jurisdiction is proper pursuant to 28 U.S.C. §1332 because complete diversity exists and the amount in controversy is in the millions of dollars.

14. Personal jurisdiction exists in this Court. Each Defendant has conducted extensive business within the State of Kansas and therefore has had sufficient minimum contacts with the State.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the transactions, events, and occurrences giving rise to the claims at issue occurred in the State of Kansas.

## BACKGROUND

### A. The Successful Operation of Crescent Under Phillip Near

16. Near began working at Crescent Oil on August 1, 1989. At that time, Crescent Oil was distributing approximately 2 million gallons of fuel per year.

17. Near became President of Crescent in 1998. In 2003, he became the majority shareholder of Crescent, owning slightly more than 52% of the outstanding stock in Crescent Fuels, the parent corporation for all the Crescent entities.

18. Under Near's leadership, Crescent's operations expanded exponentially. By way of comparison to the year he began his employment at Crescent, in 2008 Crescent was distributing over 300 million gallons of fuel per year and had almost $1 Billion in sales.

19. In 2008, and under Near's leadership, Crescent was one of ConocoPhillips' top five fuel distributors in the country and one of Shell Oil's top ten distributors.

20. Crescent owned, operated and provided fuel to hundreds of convenience stores located throughout Kansas and surrounding states. As of June 2008, Crescent had 340 fuel outlets.

21. Near's reputation with fuel vendors, including ConocoPhillips, Valero, and Shell Oil to name a few, was stellar and second to none. He was well respected by all vendors. Near was, and still is, a man of his word and has always conducted business in the most ethical manner.

22. Due to Near's business reputation, Crescent's fuel vendors provided substantial lines of credit to Crescent which allowed it to purchase fuel for distribution to its customers. Near would personally guarantee these lines of credit which, at times, exceeded $20 million.

23. With his contacts and business acumen, Near was the heart and soul of Crescent. In fact, Near routinely provided personal guarantees for debts incurred by Crescent. One such guarantee was on a note/line of credit held by M&I Bank. The amount due on that note exceeds $35 million.

**B. <u>The Beginning of the Swindling by Defendants</u>**

24. In 2008, Crescent began a search for an equity partner or merger candidate to assist in its expansion efforts. In that connection, Crescent and Near were introduced to Titan. Near met Chance, president and CEO of Titan in June 2008. He met Crivello and Marks shortly thereafter.

25. Chance, Crivello and Marks touted not only the economic prowess of Titan, but themselves as well. Specifically, Near was told time and again that Crivello and Marks were seasoned veterans in the financial world and that both had a long history of financial success.

26. From the get-go, and in an effort to induce Near into entering into certain agreements, Chance, Crivello, and Marks touted the energy operations of Titan. In the

summer and fall of 2008, these Defendants told Near – in person and via telephone – time and again how Titan would be the perfect entity to purchase Crescent and allow it to expand.

27. Near was told about Titan's 2007 $30 million purchase of a large fuel distributor in Tennessee named Appalachia Oil Company ("Appco"). Beginning with his first meeting with Chance in June 2008, and extending throughout the summer months, Crivello, Marks, and Chance explained to Near that Titan's strategic plan was to purchase successful fuel and energy companies like Appco and Crescent in order to give Titan a platform in which it would eventually provide renewable energy and fuel, such as ethanol. Crivello told Near on more than one occasion that renewable energy was the "next dot com."

28. Near believed these representations and believed the individual Defendants when they told him Titan was successful and would continue to be so in the future.

29. Crivello, Marks, and Chance told Near – in person, in Kansas, and on several occasions – that Titan wanted to purchase Crescent and then merge Appco into Crescent.

30. Titan, Crivello, Marks and Chance all assured Near that the sale of Crescent to Titan would be extremely lucrative and beneficial to him. They also told Near that the synergy Titan had with its recent acquisition of Appco would allow Crescent to continue its meteoric rise that began under the leadership of Near. These representations were false when made and Defendants knew it.

31. These Defendants also told Near they had been successful in past business endeavors, that they had the money to finance the acquisition of Crescent, and that they wanted Near to remain the Chief Executive Officer of Crescent. These representations were false when made and Defendants knew it.

C. **What the Defendants' Concealed From Near**

32. Titan, Crivello, Marks and Chance concealed from Near that they were not as successful in their past financial endeavors.

33. It was concealed from Near that companies operated by Marks and Crivello failed under their leadership and filed for bankruptcy.

34. It was also concealed from Near that Crivello's past business dealings resulted in a personal bankruptcy, a felony conviction, and other unethical and criminal action that spawned several court cases involving his past partners and legal counsel. *See e.g. In Re Crivello*, 134 F.3d 831 (7th Cir. 1998); *In Re Disciplinary Proceedings Against Steiner*, 591 N.W.2d 857 (Wis. 1999) (Crivello's attorney's license to practice law suspended for 60 days); *In Re Disciplinary Proceedings Against Frank*, 556 N.W.2d 717 (Wis. 1996) (Crivello's attorney's license to practice law suspended for 90 days); *Feingold v. United States*, 49 F.3d 437 (8th Cir. 1995) (bank fraud conviction of Crivello's partner affirmed).

35. Titan, Crivello, Marks and Chance had a duty to disclose these facts to Near.

D. **Titan's Fraudulent "Purchase" of Crescent**

36. Near relied on the representations made by Titan, Crivello, Marks and Chance. Wanting Crescent to succeed even more than it did under his stellar leadership,

Near and the remaining shareholders of Crescent began negotiations for the sale of Crescent to Titan.

37. Of major concern to Near was his outstanding personal guarantees in connection with Crescent's operations. This specifically included the $35 million outstanding loan with M&I Bank.

38. Near would not agree to any sale of Crescent to Titan should that personal guarantee remain outstanding.

39. In the late summer of 2008, Titan, Crivello, Marks, and Chance began negotiating with M&I Bank in an effort to reduce the outstanding debt Crescent (and Near, via his personal guarantee) owed. These Defendants took over all negotiations in this respect. Near was excluded from all loan settlement and negotiation discussions by Crivello, who told Near his involvement would be "counterproductive." Near acquiesced in this approach in reliance on the aforementioned misrepresentations.

40. In August 2008, M&I Bank agreed to discount the outstanding balance on its loan (of which Near has a personal guarantee) by $19 million.

41. The remaining debt would be further paid down by Crescent obtaining a cash settlement of a lucrative incentive program between it and ConocoPhillips. Defendants induced Crescent and Near to draw cash from the incentive program with their false representations that they were ready, willing, and able to go forward with the financing and closing of the Crescent sale. Under that incentive program, Crescent was owed approximately $1.7 million on an annual basis for a period of eight years. While the program would be very profitable for Crescent, it was not profitable for ConocoPhillips. ConocoPhillips was therefore willing to end the inventive program in

exchange for a one-time only payment of $6,675,000 to Crescent. This was an extremely steep discount from the amount ConocoPhillips would pay under the original program. Crescent, and Near, accepted this offer because of the desire to consummate the Titan purchase. When the payment was accepted in early October 2008, Titan was assuring Near that Greystone was ready to close the deal. Near relied on this representation.

42. Thus, the plan as envisioned in August 2008 was for the pay down of M&I Bank's debt with the ConocoPhillips payment and the M&I Bank write-down, with the remaining debt being acquired and refinanced by Greystone.

43. Defendants time and again represented they had the financing wherewithal to close the deal. In particular, Defendants represented the financing would be provided by Greystone. Titan's website lists Greystone as one of its "strategic relationships." Greystone has participated in numerous financial deals with Titan, Crivello and Marks.

44. The relationship between Crivello and Greystone is especially close. Crivello told Near that one of his neighbor's in Florida is a principle of Greystone. That individual and Crivello meet regularly for breakfast and discuss business ventures and deals.

45. Near and others at Crescent worked incessantly on due diligence issues in August, September, and October 2008. Greystone and its counsel, Goldberg Kohn, had substantial contact with and visits to Kansas to examine due diligence documentation. So too did Titan and, specifically Chance. Crivello and Marks visited Kansas in September 2008. During those visits, Crivello and Marks repeatedly told Near the anticipated closing would be a success. Crivello told Near time and again that he was the "greatest asset" of Crescent and that he (Crivello) and Marks wanted Near to manage the ongoing

operations after the closing and to make additional acquisitions. They also told Near they had a loan commitment from Greystone to take out the M&I Bank loan. That was one hundred percent (100%) false.

46. Titan, Crivello, Marks, and Chance ultimately devised a scheme whereby Titan would induce Near and the other shareholders to sell Crescent to them in return for stock in Titan, warrants to buy additional Titan Stock, a nominal cash payment, and – most importantly – the taking out of the M&I Bank debt. This was critical to Near, given his personal guarantee on that debt. They further induced Near to sell his shares with the promise that he would remain the Chief Executive Officer of Crescent. Defendants executed the scheme, in part, by inducing Near to sign a Stock Purchase Agreement.

47. Based on these representations of the Defendants, Crescent and Near sent materials to Greystone and Goldberg Kohn in anticipation of the closing. On October 6, 2008, prior to the execution of any Stock Purchase Agreement, Crescent additionally delivered stock certificates of the Crescent entities issued to Titan to Goldberg Kohn for delivery to Greystone only if closing occurred. These Certificates were to be held in trust by Goldberg Kohn, and Goldberg Kohn knew this.

48. On October 28, 2008, Near was fraudulently induced into executing a Stock Purchase Agreement (sometimes referred to herein as "the Agreement") with Titan.

49. The "effective date" of the Agreement was October 1, 2008.

50. However, not wanting to miss its 10K filing deadline (again), and risk being de-listed from the public exchange, Titan chose not to account for the Agreement until January 15, 2009 – after the deadline passed. This date was chosen out of thin air. Titan, Chance, Marks, and Crivello filed a Form 8-K with the SEC on January 22, 2009,

stating Titan completed the purchase of Crescent on January 15, 2009. This was a false filing because the deal was not completed due to the complete failure of the Defendants to provide any consideration to Near as required.

51. Section 2.1 sets forth the purchase price Titan is to pay Near for his 52% ownership in Crescent:

> Purchase Price. The purchase price for the common stock shall be an aggregate of $980,244, consisting of (i) $1.00 in cash per share ($5,244 in the aggregate), plus 325,000 shares of the common stock of Purchaser, which Purchaser values at $975,000 ($3.00 per share), together with the additional consideration set forth in Section 2.2, below.

52. The Agreement also provides for additional consideration to Near, in the form of relief from his personal guarantee of the M&I Bank Loan. This essentially occurred in a two-step process. First, under section 2.2(b), Titan promised to have Defendant Greystone, its long-time creditor and "strategic" business partner, purchase the M&I Bank debt:

> (b) Purchaser shall acquire and/or cause Greystone Business Credit to acquire from M&I Marshall & Ilsley Bank ("M&I Bank") all of the indebtedness owed by the Company's [Crescent Fuels] subsidiaries, Crescent Oil Company, Inc. and Crescent Stores, Inc. (save and except a certain equipment lease due M&I Equipment Finance which shall remain due and owing). Seller's [Near's] personal guarantee of such indebtedness shall be modified as provided in (c) below, and all suits, claims and causes of action, whatsoever in favor of said Bank arising from, or in any way relating to such indebtedness, shall be deemed as of closing released and discharged as against Seller and as against the officers, directors, stockholders and employees of the Company and its subsidiaries. . .

53. The second step, found at section 2.2(c), called for Near's personal guarantee of the M&I loan to be limited from the full amount of the loan (in excess of $35 million) to $16 million and, importantly, to be further reduced by various sources of

funds from Crescent and Appco, including the $6,675,000 rebate from ConocoPhillips. That rebate alone – which was obtained and paid directly to M&I Bank – should have reduced Near's guarantee to less than $10 million.

54. In addition, § 2.2(h) requires Titan to make a good faith effort to obtain a release of *all* Near's outstanding personal guarantees:

> (h) Purchaser and the Company shall in good faith attempt to secure release of all of Seller's [Near's] personal guarantees for corporate debts and obligations on or before 9/30/11, except with respect to the guaranteed indebtedness due Greystone Business Credit, the reduction of Seller's liability upon personal guarantee shall proceed in accordance with 2.2(c), above.

55. Despite assurance from Defendants, Greystone never delivered any consideration nor did they perform additional required actions, including not but limited to, buying out the M&I Bank loan, thereby extinguishing Near's personal guarantee. This was in direct contradiction to the representations make by Titan, Crivello, Marks, and Chance.

56. Crescent demanded Greystone's lawyers, Goldberg Kohn, and Greystone itself to return the Crescent entities' stock certificates issued to Titan. Goldberg Kohn and Greystone have wholly failed and refused in direct breach of their fiduciary obligation to return the stock certificates of Crescent, which they held in trust. On November 20, 2008, Jeffrey Dunlop, an attorney at Goldberg Kohn, returned Certificates for some related entities, but *not* the Certificate for Crescent Fuels – the parent company of the Crescent Entities. Instead, upon information and belief, Goldberg Kohn, at the request of Greystone and Defendants, sent that Certificate to Titan. In so doing, Greystone and Goldberg Kohn wrongfully and illegally converted the Certificate and thus

resulting shares of Crescent Fuels. This significantly harmed Near because he was the majority shareholder of Crescent Fuels.

57. The failure to close in October 2008 caused M&I Bank to continue to require Near to guarantee all the of outstanding debt to M&I Bank.

58. By December 1, 2008, Crescent, Near, Defendants and M&I Bank tried again and devised yet another scheme. Specifically, with their misrepresentations Defendants induced Near and Crescent to pursue another proposal with respect to the M&I Bank debt as follows:

a) M&I Bank would write down its loan by $19 million;

b) $5 to $7 million of the remaining balance would be refinanced by M&I Bank secured by the assets of Crescent Oil. This loan would be taken out by Titan on or before July 1, 2009;

c) Greystone would loan Titan $4.5 million to be used towards paying off the M&I loan balance, secured by the assets of Crescent Stores; and

d) Crescent would raise $1.5 million in equity to be paid to M&I Bank.

59. Chance, Crivello, and Marks specifically and personally represented that Greystone, the longtime partner of Titan, had committed to the smaller $4.5 million loan. They also told Near that Titan had additional funding to pay off the new $5 to $7 million loan to be issued by M&I Bank as a part of the restructuring. These Defendants knew these statements were false when made. They also represented that they (and Titan) had the financial wherewithal to take out the refinanced M&I loan.

60. Believing they were true, Near relied on these statements and assisted in raising the $1.5 million in additional equity from the other shareholders of Crescent. The

entire amount was obtained and ready to be issued, but was ultimately returned when the closing – as explained in more detail below – once again failed to come to fruition.

E. **The Fleecing of Appco and its Detrimental Effect on Near**

61. At the same time Near was working feverishly to obtain additional equity to help pay off the M&I Bank loan and his accompanying personal guarantee, Defendants were running Appco – the proposed "sister corporation" that would provide incredible synergy for Crescent – into the ground.

62. Funds from the operation of Crescent and Appco could have eliminated Near's personal guarantees altogether. Unfortunately, *after* Near executed the Agreement, and *after* Defendants represented to Near that the synergy between Appco and Crescent would be phenomenally successful, Near discovered that all Defendants (including Greystone, Titan's lender/partner in that transaction as well) were looting the once extremely successful operations of Appco to the tune of millions and millions of dollars, leaving it bankrupt and unable to continue operations.

63. What happened to Appco is eerily similar in all respects to what Titan and the other Defendants did to Crescent. Titan purchased Appco in 2007 for $30 million in cash. At that time, Appco – like Crescent – was a vibrant fuel distributor in Tennessee and the owner/operator of numerous convenience stores. Appco had been successful for decades up until Titan and the other Defendants entered the picture.

64. Titan's purchase of Appco was essentially leveraged 100%. Half of the $30 million purchase price was paid with a loan from Greystone, Titan's "strategic" partner. The remaining purchase price was raised by Titan entering into sale/lease back agreements with the prior owner of Appco.

65. Once the Appco transaction closed, the Defendants almost immediately started draining money from Appco's operations.

66. Titan and the individual Defendants would withdraw tens of thousands of dollars to go to Appco's "parent corporation" without any consideration whatsoever. Crivello also drained funds from Appco by his receipt of a $750,000 payment to his company "The Crivello Group" as a "finder's fee."

67. Greystone also participated in the looting of Appco. Greystone drained approximately 50% of Appco's *daily receipts* into a Greystone lockbox it controlled, thereby reaping millions of dollars and putting a stranglehold on Appco.

68. Crivello and Marks condoned Greystone's stranglehold. In fact, they benefited personally, to the detriment of Near. Personal assets pledge by Crivello and Marks for the Greystone loan used to purchase Appco were released upon Greystone's looting of Appco's accounts.

69. The Defendants' destruction of Appco had a very real, profound, and pertinent adverse effect on what happened to Crescent and ultimately Near.

70. Following the execution of the Stock Purchase Agreement, Titan, Crivello, Marks and Chance instructed Near and others at Crescent to assist Appco, now Crescent's "sister corporation," through its financial difficulties, which were, of course, brought about by the actions of the Defendants.

71. This is how it worked: Near had an extremely good reputation with numerous fuel vendors. Based on that reputation, he – and thus Crescent – had extensive lines of credit with those vendors. Appco – because of Defendant's fleecing – did not. Defendants' way around this obstacle was to induce and cause Crescent, via Near, to

purchase fuel for Appco on their lines of credit. Appco, in turn, would sell the fuel to its customers and was to pay Crescent back.

72. However, the Defendants simply caused Appco to be unable to pay for the fuel delivered by Crescent and thus caused Appco to refuse to pay Crescent for the fuel it purchased on Crescent and Near's lines of credit. This was due, in large part, to the Defendants' instructions to Appco and the Defendants' looting of Appco.

73. The Defendants induced Crescent to deliver fuel to Appco. In the end, Crescent was on the hook for not only its fuel, but Appco's fuel valued at $1.5 Million, which Appco could not and would not pay. Again, payment of that amount could also have been put toward the M&I Bank loan and thus further pay down Near's personal guarantee of that loan.

74. The actions of the Defendants in looting Appco and Crescent by means of the fuel delivers described above and the Defendants' actions in causing Appco to refuse to pay Crescent and to be unable to pay Crescent caused Crescent's fuel vendors to restrict Crescent's lines of credit. This restriction of credit lead to a further economic crunch for Crescent.

75. After a complete looting Appco, Titan, Crivello, Marks, and Chance continued their looting of Crescent for millions of dollars, just as they had Appco. The Defendants took thousands upon thousands of dollars from Crescent by wire transfers to Titan or the Defendants individually – without any consideration whatsoever.

76. By January 30, 2009, only a few short months after the Agreement was executed (and fifteen days after Titan told the SEC the it had purchased Crescent), the Defendants had looted over $500,000 from Crescent.

**F. The Default of the M&I Bank Loan Due to Defendants' Actions**

77. Meanwhile, throughout 2008 the amount of debt outstanding to M&I continued to increase. Defendants looting of funds made it impossible for that loan to be paid down or for Near's personal guarantee to be removed.

78. In late 2008, Near discovered that Titan, Crivello, Marks, and Chance had convinced M&I Bank to offer to write off $19 million of its outstanding loan conditioned on payment of the balance.

79. A reduction of the M&I Bank loan was beneficial to Titan, Crivello, Marks, and Chance because a purchase by Titan of the M&I Bank loan at a discount of $19 million would instantly put $19 million of equity Titan's books. This equity was desperately needed by Titan, a publicly held company, which needed to improve its dismal balance sheet. Than $19 Million of instant equity would permit Titan to continue to loot money from unsuspecting victims.

80. While all of this was going on between the execution of the Agreement and the end of 2008, Near believed he would be paid cash, receive valuable stock and warrants, and have his personal guarantees, including the one with M&I Bank, wiped out. None of that happened.

81. To this date, Near has never received *any* of the compensation he is entitled to under the Agreement.

82. Greystone refused to take over the M&I Bank loan after M&I Bank had pushed back the closing on several occasions. Despite the promises made by Titan in the Agreement, Near's personal guarantee on the M&I Bank loan was not diminished at all.

83. The conduct of Defendants caused M&I Bank to declare the entire loan – with a balance of $38,344,785.53 – to be in default. Demand for immediate payment was made to Crescent and Near.

84. Astonishingly, on January 29, 2009 – the day before M&I Bank declared default – Titan, via Chance and Marks, continued their looting of Crescent by directing Crescent to wire $90,000 to a bank account in Milwaukee. Titan has no office in Milwaukee. Crescent has no office in Milwaukee. Marks, however, operates a number of companies in Milwaukee.

85. When a default was declared on January 30, 2009, M&I Bank immediately froze all of Crescent's accounts. It returned as non-paid due to insufficient funds several checks that Crescent had written to various governmental entities for the payment of fuel excise taxes. Although the fuel tax relates to fuel sold by Crescent, Near is nevertheless personally liable for those taxes. The amount of those taxes exceeds $6 Million.

## G. Crescent is Forced to File Bankruptcy

86. The Defendants' conduct, including but not limited to, the looting of Crescent lead to only one option: bankruptcy.

87. Crescent filed for bankruptcy relief on February 7, 2009. For the same reasons, Appco was forced to file for bankruptcy two days later.

88. Chance and other management executives from Titan have been removed from their control by the bankruptcy court in Appco's case. A trustee has been appointed.

89. In Crescent's case, Chance, Marks, and Crivello are still directing the actions of Crescent and, not surprisingly, being well compensated in the process. Bankruptcy filings show that Chance is being paid thousands and thousand of dollars per month! Meanwhile, the assets of Crescent are being sold off and customer and vendor relationships irrevocably damaged. So too is the reputation of Near. For example, prior customers and vendors of Near have expressed reluctance to conduct any business with him in the future. This includes fuel companies' willingness to provide lines of credit, something that is absolutely indispensable in the fuel distribution business.

90. Further, as Crescent employees are being laid off, executives of Titan are literally riding around southeast Kansas in a Bentley as they continue their drain of Crescent's remaining assets.

**H. <u>Near Has Suffered Substantial Damage</u>**

91. The insult to injury came on March 31, 2009. On that day, Titan, via Chance, terminated Near.

92. Near has received no compensation or consideration from any of the Defendants. He is no longer employed by Crescent. The only thing Near has as a result of Defendants' actions is millions of dollars in debt.

93. The damages Near has suffered at the hands of the Defendants is truly staggering. Aside from his loss of employment, Near was to be compensated $975,000 for the sale of his ownership in Crescent. He has received nothing.

94. Worse, contrary to the Agreement, Near is liable for personal guarantees in the millions of dollars. These include, without limitation, over $35 Million on the

M&I Bank loan, $6 Million for unpaid fuel excise taxes, over $5 Million for money owed to fuel vendors, and over $1 Million for lease guarantees.

95. Near has also had his reputation substantially and possible irreversibly damaged. His ability to participate in the fuel distribution business in the future (including his ability to obtain necessary lines of credit) has been drastically curtailed because of the Defendants' action.

96. Defendants are jointly and severally liable for Near's damages.

**COUNT I – FRAUD**
**(Against Titan, Crivello, Marks and Chance)**

97. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

98. As set forth in detail above, Titan, Crivello, Marks, and Chance made false and blatant misrepresentations to Near.

99. These false representations concerned the sale of Near's interest in Crescent and the payment to him – in the form of cash, stock, warrants, and relief from numerous personal guarantees.

100. Particularly, but without exclusion, Titan, Crivello, Marks and Chance falsely represented to Near:

a) Titan would provide a platform for Crescent to continue the expansion that occurred under Near's leadership;

b) Near would be paid cash, stock and warrants in Titan, and be released of millions of dollars in personal guarantees in exchange for the sale of his ownership in Crescent all of which are valued at in excess of $50 million;

c) Greystone and/or Titan would pay down the huge M&I loan on which Near has a personal guarantee;

d) Greystone had committed to funding the take out of the M&I loan;

e) Titan's acquisition of Appco would provide synergy for the further growth of Crescent;

f) Titan had the financial wherewithal to complete the purchase;

g) Titan would continue to employ Near to run Crescent's operations; and

h) Titan, Crivello, and Marks had a long history of financial success.

101. Each and every one of these representations was false.

102. Titan, Crivello, Marks and Chance knew these representations were false when made, but they intended for Near to rely on them.

103. The representations made by Titan, Crivello, Marks and Chance were material to Near's decision to execute the Stock Purchase Agreement and make thousands of dollars in payments from Crescent to the Defendants.

104. Near did not know, nor could he have discovered, that the representations made by Titan, Crivello, Marks and Chance were false.

105. Near justifiably relied on the false representations made by Titan, Crivello, Marks and Chance.

106. The actions of these Defendants were done in a willful, deliberate, wanton, and malicious manner and without regard to the truth or falsity of its statements and actions.

107. As a result of Defendants' actions, Near has been severely damaged in a significant amount to be determined at trial.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Defendants Titan, Crivello, Marks and Chance in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT II – FRAUDULENT INDUCEMENT**
**(Against Titan, Crivello, Marks and Chance)**

108. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

109. Titan, Crivello, Marks, and Chance made material representations to Near that were false in order to induce him to execute the Stock Purchase Agreement. These representations included, among other things and without limitation:

a) Titan would provide a platform for Crescent to continue the expansion that occurred under Near's leadership;

b) Near would be paid cash, stock and warrants in Titan, and be released of millions of dollars in personal guarantees in exchange for the sale of his ownership in Crescent all of which are valued at in excess of $50 Million;

c) Greystone and/or Titan would pay down the huge M&I loan on which Near has a personal guarantee;

d) Greystone had committed to funding the take out of the M&I loan;

e) Titan's acquisition of Appco would provide synergy for the further growth of Crescent;

f) Titan had the financial wherewithal to complete the purchase;

g) Titan would continue to employ Near to run Crescent's operations; and

h) Titan, Crivello, and Marks had a long history of financial success.

110. Titan, Crivello, Marks and Chance knew these and other representations were false at the time they were made.

111. Yet, these Defendants intended, with their false representations, to induce Near to enter into the Stock Purchase Agreement.

112. Near did not know these Defendants' representations were false.

113. In fact, Near relied on the false representations in executing the Stock Purchase Agreement.

114. Near's reliance was justifiable.

115. Titan, Crivello, Marks and Chances' actions were done in a willful, deliberate, wanton, and malicious manner and without regard to the truth or falsity of its statements and actions.

116. As a result of these Defendants' actions, Near have been severely damaged in a significant amount to be determined at trial.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Defendants Titan, Crivello, Marks and Chance in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT III – NEGLIGENT MISREPRESENTATION**
**(Against Titan, Crivello, Marks and Chance)**

117. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

118. During the course their business and dealings with Near, Defendants Titan, Crivello, Marks and Chance provided false and misleading information to Near.

119. The false and misleading representations are set forth in detail in the preceding count.

120. Titan, Crivello, Marks and Chance knew Near would rely upon the information provided by Defendants in their business transaction and dealings with Near regarding Titan's purchase and operation of Crescent.

121. Titan, Crivello, Marks and Chance failed to exercise reasonable care or competence in obtaining and communicating information to Near.

122. Near has suffered loss as a direct and proximate result of Defendants' negligent misrepresentation.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Defendants Titan, Crivello, Marks and Chance in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT IV – FRAUD BY SILENCE**
**(Against Titan, Crivello, Marks and Chance)**

123. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

124. When Titan, Crivello, Marks and Chance dealt with Near regarding his sale of Crescent and the funding of future operations of the company, through their experience and knowledge of facts unbeknownst to Near, were in a position of superiority over Near.

125. These Defendants knew material things Near did not including, without limitation, the fact that Appco was not financially stable and would not provide "synergy" for Crescent, that the individual Defendants were not financially successful as represented, that Titan had no wherewithal to pay anything under the Agreement, and that Crivello had a history of shady dealings that culminated with his felony conviction.

126. Each of these facts was material to Near.

127. Defendants had a duty to disclose those facts.

128. But these Defendants did not disclose to Near these and all other material facts that relate directly to his sale of Crescent and the future operations of the company.

129. Near reasonably relied on Titan, Crivello, Marks and Chance to disclose facts over which they were in a position of superiority, by virtue of their experience and first hand knowledge.

130. These Defendants' suppression of and failure to disclose the foregoing material facts was done knowingly, intentionally, and/or recklessly.

131. Titan, Crivello, Marks and Chance made the foregoing omissions with the intention that Near would rely thereon.

132. As a direct result of these Defendants' omissions, Near has been severely damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Defendants Titan, Crivello, Marks and Chance in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT V – BREACH OF CONTRACT**
**(Against Titan)**

133. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

134. Near and Titan entered into a valid and binding Stock Purchase Agreement requiring Titan to pay Near money, stock, warrants, and provide relief from his personal guarantees in exchange for the sale of his majority interest in Crescent.

135. Near met and satisfied all of his obligations under the Agreement.

136. Titan breached its obligations under the Agreement

137. As a result of Titan's breach, Near has suffered damages in the millions of dollars to be proven at trial.

WHEREFORE Near prays for judgment in his favor and against Titan in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT VI – CONVERSION**
**(Against Titan, Crivello, Marks and Chance)**

138. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

139. Titan, Crivello, Marks and Chance, without authorization, improperly and illegally assumed Near's right of ownership in Crescent.

140. Titan, Crivello, Marks and Chance excluded Near from his ownership interest in Greystone by, among other things, taking his ownership in Crescent without paying any compensation whatsoever.

141. Near and Near alone is entitled to the rights of his ownership in Crescent.

142. The actions of these Defendants has deprived Near his ownership interest in Crescent and amount to conversion.

143. Titan, Crivello, Marks and Chances' conversion was intentional, without excuse or justification, and done with malice.

144. As a result of this conversion, Near has been severely damaged in an amount to be proved at trial.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Titan, Crivello, Marks, and Chance in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT VII – CONVERSION**
**(Against Greystone)**

145. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

146. Greystone, without authorization, assumed Near's right of ownership in Crescent.

147. Greystone, through its agent and counsel, specifically refused to return to Near the stock certificate issuing all shares in Crescent Fuel, the parent company for all Crescent companies, to Titan.

148. That stock certificate should have been returned – as requested – when the closing of the Titan/Crescent transaction did not occur and/or when it became evident that Titan was not going to make the required payments to Near as required by the Agreement.

149. Greystone's wrongful assumption of the stock certificate has deprived Near his ownership interest in Crescent.

150. Greystone's actions amount to conversion.

151. Greystone's conversion was intentional, without excuse or justification, and done with malice.

152. As a result of Greystone's conversion, Near has been severely damaged in an amount to be proved at trial.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Greystone in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs

and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT VIII – CONVERSION**
**(Against Goldberg Kohn)**

153. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

154. Goldberg Kohn, without authorization, assumed Near's right of ownership in Crescent.

155. Goldberg Kohn specifically refused to return to Near the stock certificate issuing all shares in Crescent Fuel, the parent company for all Crescent companies, to Titan.

156. That stock certificate should have been returned – as requested – when the closing of the Titan/Crescent transaction did not occur and/or when it became evident that Titan was not going to make the required payments to Near as required by the Agreement.

157. Goldberg Kohn's wrongful assumption of the stock certificate has deprived Near his ownership interest in Crescent.

158. Goldberg Kohn's actions amount to conversion.

159. Goldberg Kohn's conversion was intentional, without excuse or justification, and done with malice.

160. As a result of Goldberg Kohn's conversion, Near has been severely damaged in an amount to be proved at trial.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Goldberg Kohn in a fair and reasonable amount to compensate him for damages he has

suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT IX – CIVIL CONSPIRACY**
**(Against All Defendants)**

161. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

162. Defendants, each and every one, conspired and agreed among themselves to terminate and convert Near's ownership interest in Crescent.

163. The object Defendants sought to accomplish, and indeed what was accomplished, was the conversion of Near's ownership in Crescent.

164. Defendants' intentions and actions constituted a "meeting of minds" necessary for a civil conspiracy.

165. Defendants' actions were overt and unlawful.

166. As a proximate result of Defendants' actions, Near has been severely damaged in an amount to be proven at trial.

167. The actions and conspiracy of Defendants were done in a willful, wanton and malicious manner.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Defendants in a fair and reasonable amount to compensate him for damages he has suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**COUNT X – BREACH OF FIDUCIARY DUTY**
**(Against Goldberg Kohn)**

168. Plaintiff incorporates herein by reference, as if fully stated herein, the contents of all preceding paragraphs.

169. Near's stock certificate for Crescent was delivered to Goldberg Kohn, in confidence, to be kept in trust.

170. Near trusted Goldberg Kohn to keep that Certificate in trust, to be delivered only upon closing.

171. Goldberg Kohn received the Certificate in trust.

172. Goldberg Kohn had complete and absolute control over the Certificate.

173. The relationship of trust and confidence Near placed in Goldberg Kohn created a fiduciary relationship.

174. As such, Goldberg Kohn owed a fiduciary duty to Near.

175. Goldberg Kohn consciously assumed this duty.

176. Goldberg Kohn breached its fiduciary duty to Near with its failure to return the stock Certificate.

177. As a direct and proximate result of Goldberg Kohn's breach of its fiduciary duty to Near, Near has sustained severe and substantial damages in an amount to be proven at trial.

178. Goldberg Kohn's actions were wanton and malicious, or showed a reckless disregard for the rights of Near, justifying punitive damages to punish this wrongful conduct to deter similar conduct in the future.

WHEREFORE, Plaintiff Near prays for judgment in his favor and against Goldberg Kohn in a fair and reasonable amount to compensate him for damages he has

suffered and will suffer, as will be determined at trial, for punitive damages, for his costs and disbursements in this action, including attorneys' fees and expenses, and for such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues of fact and damages in this action.

**DESIGNATION OF PLACE OF TRIAL**

Plaintiff hereby designates Kansas City, Kansas as the place of trial in this matter.

Dated: May 4, 2009

Respectfully submitted,

**EDGAR LAW FIRM LLC**

/s/ Michael D. Pospisil

Michael D. Pospisil #18540
John M. Edgar KS FED #70270
1032 Pennsylvania Venue
Kansas City, Missouri 64105
Telephone: (816) 531-0033
Facsimile: (816) 531-3322

Attorneys for Plaintiff Phillip Near